# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JS-6

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge | |
|---|---|---|
| Wendy Hernandez | | Not Reported |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiff(s): | | Attorneys Present for Defendant(s): |
| Not Present | | Not Present |

**Proceedings (In Chambers):**   **Order GRANTING Federal Defendants' and Defendant-Intervenor's Motions for Summary Judgment and DENYING Plaintiffs' Motion for Summary Judgment**

Before the Court is Defendants United States Army Corps of Engineers (the "Corps") and Col. Kimberly Colloton's (collectively, "Federal Defendants") motion for summary judgment (Dkt. # 92); Defendant-Intervenor The Newhall Land and Farming Company's ("Newhall") motion for summary judgment (Dkt. # 91); and Plaintiffs Center for Biological Diversity, Wishtoyo Foundation, Ventura Coastkeeper, Friends of the Santa Clara River, Santa Clarita Organization for Planning the Environment, and Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation's  ("Plaintiffs") motion for summary judgment (Dkt. # 93).  After considering the arguments in the supporting and opposing papers and those presented at a hearing on June 29, 2015, the Court GRANTS Federal Defendants' and Newhall's motions for summary judgment and DENIES Plaintiffs' motion for summary judgment.

I.    Background

    A.    Factual Background

This case involves a very large-scale residential, commercial, industrial, and retail project (the "Project") that Newhall plans to develop in northwest unincorporated Los Angeles County (the "County"), near the city of Santa Clarita.  *See* Dkt. # 110, *Pl. Statement of Genuine Issues of Fact* ("PSGIF") ¶¶ 1,4.  The Project area includes approximately 12,000 acres covered by the Newhall Ranch Specific Plan (the "Specific Plan"), encompassing 5.5 linear miles of the Santa Clara River and several of its tributaries, and 1,517 acres of the adjacent Salt Creek open space conservation area in Ventura County.  *Id.*  The County adopted the Newhall Ranch Specific Plan in 2003 to guide the development of the Project.  *Id.* ¶ 3.  The Specific Plan envisions a large-scale community composed of residential, mixed-use, and supporting uses in interrelated villages.  *Id.* ¶ 4.  It provides for up to 20,880 residential units on 2,391 acres, about 5.5 million

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|---------------|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

square feet of commercial, business park, office, and retail uses on 258 acres, and about 642 acres of public facilities and amenities including parks, schools, libraries, trails, and a water reclamation plant. *Id.*

Relevant to this case, development of the Project requires the issuance of a permit to discharge dredge or fill materials into the waters of the United States. *See id.* ¶ 5; 33 U.S.C. § 1311, 1344 (provisions of the federal Clean Water Act). Such a permit is known as a "Section 404 Permit" and the Corps is the federal agency authorized to issue these permits. 33 U.S.C. § 1344. Accordingly, Newhall submitted an application to the Corps for a Section 404 Permit to allow construction of infrastructure needed to facilitate development within the Specific Plan area. *PSGIF* ¶ 5.

The Corps and the California Department of Fish and Wildlife ("CDFW") prepared a joint Environmental Impact Statement and Environmental Impact Report ("EIS") to comply with federal and state statutes. *Id.* ¶ 8. The Corps issued a Notice of Intent to prepare an EIS on January 26, 2000, and held a public scoping meeting to solicit comment of the Project on February 9, 2000. *Id.* ¶ 9. Second and third Notices of Intent were published and attendant public scoping meetings were held in 2004 and 2005. *Id.* ¶¶ 10-11. The Corps received comments regarding the Project in response to these public notices and during the public meetings. *Id.* ¶ 12.

The Corps initially considered 23 alternative sites for the Project within the region, but determined that none of them were capable of meeting the Project purpose and need. *Id.* ¶ 15. The Draft EIS then examined in-depth the direct, indirect, secondary, and cumulative impacts of seven alternatives: the No Action/No Project alternative (Alternative 1), Newhall's originally proposed Project (Alternative 2), and five build alternatives (Alternatives 3-7). *Id.* ¶ 16. Each of the five build alternatives included specific design features to avoid or minimize impacts to waters of the United States, including special aquatic sites in the Project area. *Id.*

A Notice of Availability of the Draft EIS for review and comment was published in the Federal Register on May 4, 2009, along with a public notice for the Section 404 Permit application. *Id.* ¶ 17. The Corps also held a public hearing to solicit comments on the Draft EIS on June 9, 2009. *Id.* ¶ 18. During the 116-day comment period that closed on August 25, 2009, the Corps and CDFW received 142 comment letters and spent roughly one year working on topical responses and individual responses to each comment letter and finalizing the EIS. *Id.* ¶¶ 18-19.

On June 18, 2010, the Corps published a Notice of Availability of the Final EIS and a second public notice for the Section 404 Permit application. *Id.* ¶ 20. This second public

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

comment period lasted until August 3, 2010 and the Corps' responses to comments on the Final EIS are included as an appendix to the Corps' Record of Decision ("ROD"). *Id.* ¶ 22-23. The ROD also includes Addenda to the Final EIS containing clarifications in response to comments. *Id.* ¶ 24. The Corps' Final EIS, which integrates the Draft EIS, including responses, Addenda, and technical appendices, totals approximately 32, 970 pages. *Id.* ¶ 25.

To further evaluate the effects of the discharge of dredged or fill material into the waters of the United States, the Corps prepared a separate Section 404(b)(1) analysis of the alternatives, the draft of which was made available for comment with the Final EIS and appended to the Final EIS. *See id.* ¶¶ 26, 29. This analysis included the seven alternatives included in the EIS as well as an additional Total Avoidance Alternative (Alternative 8). *Id.* ¶ 28. Based on the draft 404(b)(1) analysis, the Corps identified a modified version of Alternative 3 as the Least Environmentally Damaging Practicable Alternative ("LEDPA"). *Id.* ¶ 29. As a result of continued discussions with the CDFW, the U.S. Environmental Protection Agency ("EPA"), and California Regional Water Quality Control Board staff after the issuance of the Final EIS, the Corps required that the Draft LEDPA additionally reduce water impacts to create the Corps' official LEDPA. *Id.* ¶¶ 30-31.

In total, the LEDPA will permanently impact 47.9 acres of waters of the United States (a 48% reduction in acreage compared to Newhall's proposed Alternative 2) and temporarily disturb 35.2 acres (a 2% increase compared to Alternative 2). *Id.* ¶ 33. Permanent impacts are associated with the construction of two bridges across the Santa Clara River, the utility corridor, and future improvements to State Route 126. *Id.* ¶ 39. The LEDPA avoids permanent or temporary impacts to 576.9 acres of waters of the United States, or approximately 87% of the jurisdictional waters on site. *See id.* ¶ 34. The LEDPA also incorporates extensive mitigation both on-site and off-site, as detailed in a Mitigation and Monitoring Plan. *Id.* ¶ 48.

After the Corps notified the EPA of its intent to issue Newhall a Section 404 Permit, the EPA responded on August 29, 2011 and advised the Corps that it would not seek higher level review of the Corps' permit, acknowledging that the work to reduce adverse environmental impacts had resulted in "tangible and meaningful improvements to protect human health and the environment." *Id.* ¶ 68. On August 31, 2011, the Corps issued the ROD approving a provisional Section 404 Permit for the Project. *Id.* ¶ 69. After another requisite approval from the California Regional Water Quality Control Board, the Corps sent Newhall a letter proffering the Section 404 Permit on October 17, 2012. *Id.* ¶¶ 70-72. The Section 404 Permit became final on October 19, 2012. *Id.* ¶ 73.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|---------------|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

### B.    Procedural Background

In response to the issuance of the Section 404 Permit, Plaintiffs (except the Santa Ynez Band of the Chumash Mission Indians of the Santa Ynez Reservation ("Santa Ynez Band")) filed this lawsuit against Federal Defendants, the EPA, Gina McCarthy ("McCarthy"), and Jared Blumenfeld ("Blumenfeld") (the EPA, McCarthy, and Blumenfeld are the "EPA Defendants") on March 6, 2014.  Dkt. # 1.  This case was originally before District Judge Audrey B. Collins ("Judge Collins") and, on June 20, 2014, Judge Collins granted Newhall's unopposed motion to intervene.  *See* Dkt. # 21.  On July 22, 2014, Plaintiffs (except the Santa Ynez Band) filed a First Amended Complaint ("FAC").  Dkt. # 28.

On September 26, 2014, this Court, in response to Defendants' and Newhall's motions, dismissed the claims against the EPA Defendants for lack of subject matter jurisdiction.  *See* Dkt. # 52.  Plaintiffs (now including the Santa Ynez Band) filed the operative Second Amended Complaint ("SAC") against Federal Defendants on January 7, 2015.  Dkt. # 76.

Plaintiffs assert that Federal Defendants violated the following federal statutes: (1) the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq.*; (2) the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*; (3) the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, *et seq.*; and (4) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332, *et seq.  See id.*

The Court approved a stipulation for a modified briefing schedule and extended page limits for the summary judgment motions in this case:

    (1)    Summary judgment motions to be filed by March 2, 2015, not to exceed 50 pages each;

    (2)    Opposition briefs to be filed by April 16, 2015, not to exceed 50 pages each;

    (3)    Reply briefs filed by May 18, 2015, not to exceed 25 pages each; and

    (4)    Hearing set for June 29, 2015 at 1:30 p.m.

*See* Dkt. # 74.  Plaintiffs, Federal Defendants, and Newhall filed summary judgment motions and related briefing in accordance with this order.  *See* Dkts. # 91-93.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

II.    Legal Standard

Section 706 of the Administrative Procedures Act ("APA") provides the standard of review for each of Plaintiffs' alleged statutory violations.[1]  In reviewing agency action, the court may set aside the action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law."  *See* 5 U.S.C. § 706(2)(A), (D).

"To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one."  *Id.*  A court must invalidate an agency action if it determines that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise."  *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In this inquiry, "the standard of review is highly deferential" and "the agency's decision is entitled to a presumption of regularity."  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).  "The court is not empowered to substitute its judgment for that of the agency."  *Overton Park*, 401 U.S. at 416.  Moreover, courts' "deference to agency determinations is at its greatest when that agency is choosing between various scientific models[.]"  *San Luis*, 747 F.3d at 610; *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (when "analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies") (internal quotations omitted).

The APA instructs courts to make their judicial determinations under § 706 by "review[ing] the whole record or those parts of it cited by a party[.]"  5 U.S.C. § 706.  The Supreme Court has held that "in cases where Congress has simply provided for review [under the APA], . . . consideration is to be confined to the administrative record and [] no de novo proceeding may be held."  *U.S. v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the

---

[1] Although Plaintiffs assert their ESA claim under the ESA citizen suit provision, the APA still provides the standard of review.  *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) ("Irrespective of whether an ESA claim is brought under the APA or the citizen-suit provision, the APA's 'arbitrary and capricious' standard applies . . . ").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted).

The Ninth Circuit has endorsed styling review of agency actions under the APA as summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Generally, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). When "the district court is reviewing a decision of an administrative agency which is itself the finder of fact . . . summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* at 769.

III.    Discussion

Plaintiffs contend that the Corps violated the following federal statutes: (1) the Clean Water Act ("CWA"); (2) the Endangered Species Act ("ESA"); (3) the National Historic Preservation Act ("NHPA"); and (4) the National Environmental Protection Act ("NEPA"). The Court analyses Plaintiffs' arguments related to each statutory scheme.

A.    Clean Water Act

i.    Framework

The CWA (or the "Act") establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. *Id.* § 1311(a); *see, e.g., Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 996-97 (9th Cir. 2013). The Act defines "navigable waters" as "waters of the United States," 33 U.S.C. § 1362(7), which in turn are defined by regulation to include certain wetlands, *see* 33 C.F.R. § 328.3(a), (b).

Relevant to this case, Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill materials into wetlands through the issuance of permits. 33 U.S.C. § 1344. Individual permits are issued on a case-by-case basis after a resource intensive process that involves extensive site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination. *See generally* 33 C.F.R. Pts. 323, 325. In

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

conducting public interest review for an individual permit, the Corps balances "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

When it reviews an application for a permit to discharge dredged or fill material (a "Section 404 Permit"), the Corps must follow binding guidelines set out in regulations promulgated by the EPA in consultation with the Corp ("404(b)(1) Guidelines" codified at 40 C.F.R. Pt. 230). *See* 33 U.S.C. § 1344(b). The 404(b)(1) Guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). This requirement is known as identifying the Least Environmentally Damaging Practicable Alternative ("LEDPA"). A "practicable" alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

Because the Project does not "require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," it is not "water dependent." *See id.* § 230.10(a)(3). Thus, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.*

Where no practicable alternatives exist that would avoid filling or have a less adverse impact on wetlands, the next step in the analysis is to consider whether "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* § 230.10(d); *see also Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 544 (11th Cir. 1996) ("Where, as here, filling of wetlands cannot be avoided, then 'appropriate and practicable steps' must be taken to minimize the potential adverse impacts of the discharge on wetlands."). The "sequencing preference expressed in the CWA regulations [is]: (1) avoidance, (2) minimization, and (3) compensatory mitigation." *Fund for Animals*, 85 F.3d at 543. "Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses." 33 C.F.R. § 320.4(r)(1). "Compensation may occur on-site or at an off-site location." *Id.*

    *ii.*    *Analysis*

Plaintiffs contend that the Corps' LEDPA determination is unlawful for two primary reasons: (1) "the Corps concluded that no additional avoidance was practicable based on an arbitrary and incomplete analysis of costs"; and (2) "the Corps rejected alternatives based on an overly narrow formulation of project objectives that skewed the analysis away from additional

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

avoidance." *See Pl. Mot.* 9:11-15. Plaintiffs also argue generally that the Corps did not adequately evaluate the practicability of additional floodplain avoidance. *See id.* 16:26-17:27.[2]

  1.  Costs Analysis

  Because a "practicable" alternative is one that is "available and capable of being done after taking into consideration *cost*, existing technology, and logistics in light of overall project purposes," it was appropriate for the Corps to reject certain alternatives as impracticable if it determined that they were too costly. *See* 40 C.F.R. § 230.10(a)(2) (emphasis added); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 833-34 (9th Cir. 1986) ("The Corps did not err by taking [the applicant's] costs into account . . . [and] rationally conclud[ing] that two [alternatives] were too costly for the applicant[.]"). Plaintiffs challenge the rationality of the Corps' cost analysis on three grounds: (1) the per-acre cost comparison metric was inadequate; (2) the analysis failed to consider the revenue stream and incremental costs for each alternative; and (3) the analysis failed to consider cost savings associated with avoidance. *See Pl. Mot.* 11:3-16:25.

  The first step in the Corps' methodology for evaluating the cost practicability of alternatives was to determine the "cost per net developable acre" of each project alternative. *See* AR 766:104304-06. Given the high cost of the originally proposed Project when assessed against comparable Southern California developments, the Corps determined that a cost increase of 5-10%, compared to the originally proposed Project, may be unreasonable. AR 766:104478.[3] Thus, if the per-acre cost of the alternative unreasonably exceeded that threshold, the Corps deemed the alternative impracticable due to its high cost. *Id.* The 404(b)(1) Guidelines phrase the cost consideration generally and do not specify that the Corps should use any particular

---

[2] Plaintiffs' opposition briefs to Federal Defendants' and Newhall's summary judgment motions contain short sections stating that mitigation is not a substitution for avoidance in LEDPA analysis. *See Pl. Opp. to Def.* 8:5-13; *Pl. Opp. to Newhall* 9:18-26. However, Plaintiffs do not argue that the Corps made this impermissible substitution with any citation to the record or analysis, and the Court observes that the Corps adhered to the avoidance then mitigation sequence. *See Def. Reply* 4:1-20; *Newhall Reply* 8:1-7.

[3] In Plaintiffs' reply brief, Plaintiffs contest the Corps' inclusion of a $386 million "site acquisition cost" in the fixed costs figure for each alternative because under the circumstances of the Project, Newhall's acquisition cost was actually zero; thus, the inclusion of the cost inaccurately inflates the Project's cost as compared to other area developments. *See Pl. Reply I* 3:23-5:5. The Court declines to address the merits of this argument because it was raised for the first time on reply. *See Ojo v. Farmers Group, Inc.*, 565 F.3d 1175, 1185 n.13 (9th Cir. 2009) (observing that it is generally improper for the moving party to introduce new facts or different legal arguments in the reply brief beyond those that were presented in the moving papers).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

method in that analysis.  *See* 40 C.F.R. § 230.10(a)(2).  Thus, the Court can only conclude that using the per-acre methodology was improper if the selection of that method for this Project was arbitrary and capricious.  *See Newhall Opp.* 4:1-15.

Plaintiffs argue that reliance on the per-acre cost metric was inadequate because the methodology biased the analysis away from alternatives with a smaller development footprint, thus, the Corps should have incorporated "per-unit" (*i.e.*, per residence) cost comparisons into its analysis.  *See Pl. Mot.* 11:3-13:3.  The Corps explained its selection of the per-acre metric when responding to comments on the Final EIS.  *See Def. Opp.* 5:13-6:16.  The Corps responded that it chose to use the per-acre metric rather than the per-unit metric because it "is more widely used in the industry and better captures the relationship between cost and development potential, independent of the type and density of units that are ultimately built on the developable land."  AR 766:104750.  Because what constitutes a "unit" varies between alternatives (i.e., different sized lots and multi-family versus single family residences), "using per-unit costs would be like comparing apples to oranges."  *See Def. Opp.* 5:18-28; *see also Newhall Opp.* (the different Project alternatives "have different mixes of unit types and densities").  Additionally, the per-acre metric is appropriate for this Project because "[a]s a land developer, the product that the applicant sells is improved land" (not units) and "the net developable acre provides a more stable basis upon which to compare projects" because "[f]uture market conditions will not affect the amount of net developable acres."  *See* AR 766:104750.  Thus, the cost per developable acre is more directly relevant to the viability of the development project.  *Def. Opp.* 6:2-5.

The Corps' reasoning demonstrates that selection of the per-acre metric was certainly reasonable and likely the best metric for cost analysis for the Project, though the latter showing is not necessary under the APA standard.  Plaintiffs' own rebuttal arguments seem to endorse the reasonableness of the Corps' methodology, explaining that while the use of per-acre costs was not unreasonable, that analysis should have been coupled with consideration of per-unit costs because fixed costs are "equally accounted    for by both the per-unit and per-acre metrics" and comparison to other projects was "both equally possible with a per-unit metric, and similarly enlightening[.]"  *See Pl. Reply I* 5:12-6:3.[4]  Plaintiffs' defense of the reasonableness of the per-unit metric does not demonstrate that the Corps' use of the per-acre metric was unreasonable.

Plaintiffs also argue that the Corps' cost analysis was flawed because it failed to consider the revenue stream and incremental costs associated with each alternative.  *See Pl. Mot.* 13:4-

---

[4] Plaintiffs filed two reply briefs in support of their motion for summary judgment.  See Dkts. # 115, 116.  The first reply brief, Dkt. # 115, addresses Plaintiffs' arguments under the CWA and ESA and will be referenced in this order as "Pl. Reply I."  The second reply brief, Dkt. # 116, addresses Plaintiffs' arguments under the NHPA and NEPA and will be referred to as "Pl. Reply II."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

15:24.  Here, an appropriate rebuttal is either that the Corps did take these items into account or that it was reasonable not to do so, and the Corps' response is a combination of both.

Plaintiffs contend that the Corps should have considered each alternative's projected revenue stream when evaluating costs, inventively describing the concept as "net costs" as opposed to "gross costs."  *See Pl. Mot.* 13:17-14:5.  Defendants first respond that the 404(b)(1) Guidelines only require consideration of "costs," not projected revenue or profits.  *See* 40 C.F.R. § 230.10(a)(2) (a practicable alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics . . ."); *Newhall Opp.* 7:12-13; *Def. Opp.* 6:26-7:7.  Thus, the generally stated regulation does not instruct the Corps to estimate the revenue stream attributable to each alternative and adjust the "cost" of the alternative accordingly.  However, during the Final EIS comment period, the EPA advised that "[c]omparing costs to expected revenue would add critical context to the cost numbers and allow for more informed decision making."  *See* AR 585:64817.  The Corps responded that it was not required under the regulations to conduct this analysis; moreover, it reasoned that use of the cost per developable acre metric already incorporated the respective profitability potential of each alternative into the costs analysis.  The Corps explained:

> The Corps has effectively taken revenues into account by looking at how each alternative affects developable acreage, which is the source of revenue for the project, and cost per net developable metric is particularly appropriate for the project because the applicant would sell "blue top" lots (*i.e.*, finished lots) to other builders, rather than construct the structures (*e.g.*, residences) and sell them to end users.  USEPA has not explained how speculating about actual project revenue would be consistent with the 404(b)(1) Guidelines that specifically limit practicability to cost rather than requiring an economic analysis . . . cost per net developable acre allows cost to be evaluated in the context of revenue, without involving the Corps in a "cumbersome inquiry" into factors such as profit, operating margins, and rates of return that would be inconsistent with the Guidelines.

AR 766:104470-71.  The Corps must adhere to the 404(b)(1) Guidelines, and did so by considering practicability in light of the "cost" of each alternative.  The Corps' decision not to conduct a standalone revenue stream analysis in order to determine the "net cost" of each alternative was not unreasonable in light of the general language of the 404(b)(1) Guidelines and the way in which the per-acre cost metric did take future revenue into consideration by determining how much it would cost to develop the actual product (developable land) that Newhall would later sell to builders.  *See also Def. Opp.* 6:20-23 ("Because Newhall will be selling land, and the selling price is based on unpredictable market factors, the Corps reasonably

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

determined that the cost of developed land is a reasonable surrogate for revenue."); *Newhall Opp.* 8:5-9 ("[N]et developable acreage acts as a proxy for revenue and serves much the same purpose – providing context in which to evaluate costs – without requiring the Corps to speculate about future real estate values or set an acceptable profit margin for an applicant, functions for which the Corps is ill-equipped.").[5]  Thus, the Corps did not act arbitrarily or capriciously when it declined to conduct projected revenue stream analysis for each alternative to evaluate cost practicability.

Plaintiffs additionally contend that the Corps' cost analysis was flawed because it did not consider "incremental costs" associated with each alternative to determine "at which point the project is no longer capable of being built." *Pl. Mot.* 15:10-24.  This contention appears to be intertwined with the revenue stream argument, as Plaintiffs assert that the calculated costs were inappropriately treated as an up-front, lump-sum barrier rather than as "costs that will be incurred incrementally so that one phase's revenues will pay the cost of subsequent phases." *See Pl. Reply I* 6:13-17; *see also* AR 519:64817 (In its comments to the Final EIS, the EPA recommended that "'costs' should be examined in a more balanced way that takes into consideration not just outgoing but incoming funds and compares the impact of incremental cost increases of sub-alternatives against the costs of the overall project").  The Corps rejected this type of "incremental cost analysis" because it required locating a "'break even' point where the project would cease to be profitable due to increasing costs."  AR 766:104749.  The Corps determined that this analysis was not "feasible" or appropriate under the 404(b)(1) Guidelines because it would involve "subjective considerations relating to the applicant's financial standing and ability to earn a profit [which] are not appropriate considerations in determining whether an alternative is practicable." *Id.*; *see also* AR 766:104471.  As pointed out by Federal Defendants and Newhall, the EPA changed the word "economics" to "costs" when promulgating the regulation on practicability criteria because "[t]he term economic might be construed to include consideration of the applicant's financial standing, or investment, or market share, a cumbersome inquiry which is not necessarily material to the objectives of the Guidelines." *See Def. Opp.* 7:7-15 (citing 45 Fed. Reg. 85,335, 85,339/3 (Dec. 24, 2980)); *Newhall Opp.* 7:13-19.  The Corps' decision not to plot costs out incrementally over a multi-year build-out while incorporating a hypothetical income stream to determine cost viability was reasonable because

---

[5] The Court is not convinced that the EPA's comments on the Final EIS constituted an official interpretation of how to consider "cost" pursuant to 40 C.F.R. § 230.10(a)(2) that was binding on the Corps.  *See Pl. Mot.* 14:25-15:9; *Newhall Opp.* 10:3-14; *Pl. Reply* 7:27-8:7; *cf. Auer v. Robbins*, 519 U.S. 452, 461-63 (1997) (an agency's interpretation of its regulation presented in an amicus brief to the court was entitled to deference by the court).  Regardless, if the Corps was required to consider future profitability of the various alternatives when evaluating costs, it was not unreasonable to do so through the proxy of the cost per "product" metric rather than developed revenue projection models.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

the methodology required consideration of Newhall's financial health and determination of acceptable cash flow at different points throughout the build process.

Plaintiffs also highlight a very specific issue with the cost analysis for Alternative 7. *See Pl. Mot.* 15:25-16:25. They assert generally that the Corps' cost analysis failed to consider costs savings associated with avoiding environmental impacts, but in substance identify just one cost item that Plaintiffs contend should have been eliminated from Alternative 7's cost calculation. Each of the alternatives includes the cost of building buried bank stabilization outside of the Santa Clara River 100-year floodplain. However, because the Alternative 7 development avoids nearly all of the 100-year floodplain, Plaintiffs argue that the cost analysis for this alternative should not have included the "unnecessary infrastructure" of bank stabilization. *See Pl. Mot.* 16:14-22 ("[t]he purpose of bank stabilization built outside of the floodplain when the floodplain itself is avoided is not clear").

Newhall and the Federal Defendants respond by explaining that the Corps had concluded that "[b]ank protection would still be required to protect Specific Plan development from flooding and erosion" for Alternative 7. AR 255:30906. The "100-year floodplain" is an area around the Santa Clara River determined pursuant to Federal Emergency Management Agency ("FEMA") calculations and assumptions. *See Newhall Opp.* 11:6-11. The Corps did not conduct its flooding analysis using FEMA standards; rather, it analyzed flood potential using Los Angeles County's more conservative flood protection standards based on the "50-year capital flood." *See id.*; *Def. Opp.* 9:13-21; AR 255:30940, 30944, 30964, 31042. The County's capital flood model "yields greater design flows" than the federal standard. AR 255:30940. The Corps concluded that "[t]o prevent flooding, Alternative 7 would include bank stabilization that is designed to contain and convey the FEMA 100-year flood event and the DPW [County] capital flood event." AR 255:31042. Accordingly, the Corps determined that bank stabilization was necessary for Alternative 7, and Plaintiffs have not demonstrated that that decision was irrational. Moreover, the Corps deemed Alternative 7 impracticable not solely due to its cost, but also because it "failed to achieve the basic objectives of the Specific Plan" for the scale of residential and commercial uses. *See AR* 766:104302. Thus, the Corps determined that Alternative 7 could not be the LEDPA even if it was practicable in terms of costs.

2.    Narrow Project Objectives

The 404(b)(1) Guidelines are clear that determination of whether an alternative is "practicable" is an analysis carried out "in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). "[T]he Corps has a duty to consider the applicant's purpose . . . '[i]ndeed, it would

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.'" *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) (quoting *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985)). Plaintiffs acknowledge as much but claim that the Project's stated purpose was overly narrow such that it impermissibly excluded practicable alternatives from consideration. *Pl. Mot.* 18:3-12; *see Sylvester*, 883 F.2d at 409 ("Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable.").

> The Corps adopted the following "overall project purpose":

> the development of a master planned community with interrelated villages in the vicinity of the Santa Clarita Valley in northwestern Los Angeles County that achieves the basic objectives of the Specific Plan by providing a broad range of land uses of approximately the same size and proportions as approved in the Specific Plan, including residential, mixed-use, commercial and industrial uses, public services (schools, parks, etc.), and a water reclamation plant.

AR 766:104755. Plaintiffs assert that the Corps used the "interrelated villages" and achievement of "basic objectives of the Specific Plan" elements of the Project purpose as a "straitjacket" to reject alternatives that would provide additional avoidance of the waters of the U.S. *Pl. Mot.* 18:20-19:7. The Corps found that Alternatives 6 and 8 resulted in a substantial reduction of developable area in the easternmost section of the Project site so as to "preclude the construction of a coherent village in the eastern section of the project area." AR 766:104301-03.[6] Thus, these alternatives failed to meet the "villages" objective. *Id.* Alternative 7 "failed to achieve the basic objectives of the Specific Plan" for both residential and commercial uses because, even with increases in density (such as vertical construction), the number of residential units and commercial floor space were substantially reduced below the proposed figures. *See* AR 766:104302; *see also Newhall Opp.* 20:17-24.

> Plaintiffs do not challenge the Corps' conclusions that these alternatives failed to meet the Project's defined purpose; rather, they challenge the definition as overly narrow. However, the Court does not conclude that the Corps acted improperly in defining the Project purpose to include the elements of interrelated villages and adherence to the basic objectives of the Specific Plan then analyzing alternatives in light of that defined purpose. It was appropriate to consider Newhall's objective to develop the Project as a "community with interrelated villages." This feature was an integral part of Newhall's Project and to disregard the village format would

---

[6] The Corps' separate Section 404(b)(1) analysis of the seven alternatives included in the EIS as well as an additional Total Avoidance Alternative (Alternative 8). *PSGIF* ¶ 28.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

transform the Project into a different type of development, one designed by the Corps. *See Def. Opp.* 12:9-14; *Sylvester*, 882 F.2d at 409. The Specific Plan clusters development into villages to provide a unique identity and sense of community for each area and to locate higher-intensity land uses in proximity to each other to create walkable communities and to preserve Project area open space. *See Newhall Reply* 6:13-20 (citing AR 255:30820, 31532; AR 512:58727). Also, the "villages" attribute is not so specific that it precludes alternatives because it is a generally phrased requirement. *Cf.* AR 766:104745 (impermissible to require a specific number of residential units or acreage). Courts uphold much more specific and preclusive aspects of project objectives. *See Sylvester*, 882 F.2d at 409-10 (endorsing a defined requirement that a resort's golf course be contiguous to the resort, rather than off-site); *Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 538, 540 (M.D.N.C. 2004) (upholding defining an airport expansion project to include minimum runway length, runway configuration, and location of support facilities even though the specific elements would rule out some lower impact alternatives).

Additionally, it was appropriate for the Corps to consider the local land use objectives laid out in the Newhall Ranch Specific Plan. *See Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1240-42 (M.D. Fla. 2008) (upholding a project purpose statement for an airport that required alternatives to be "compatible with local and regional planning efforts," including a county-prepared development plan for the airport and surrounding development); *see also Alliance for Legal Action*, 314 F. Supp. 2d at 538-40. Moreover, the Corps did not adopt every detail and particularity of the Specific Plan. Rather, it identified the Specific Plan's "basic objectives" and approximate amounts and types of development and defined those key requirements and approximations as the requirements of Newhall's Project. *See Newhall Opp.* 18:21-24 (citing AR 766:104290-91).

Further, contrary to Plaintiffs' assertion that the Corps' "statement is not so much a description of the overall project purpose as a description of Newhall's preferred project," *Pl. Reply I* 10:1-2, the record demonstrates that the Corps did not define the Project objectives so that only Newhall's Project met the definition because the LEDPA differs significantly from Newhall's sponsored proposal. *See Newhall Opp.* 19:19-25 (compared to Newhall's Proposed Project (Alternative 2), the LEDPA reduces total fill of waters from 93 acres to fewer than 43 acres and reduces fill of wetlands by 75 percent, from 20.5 acres to 5.1 acres) (citing AR 766:104304, 104429, 104432). Also, consideration of the basic objectives of the Specific Plan was not unduly restrictive because the LEDPA differed substantially from the Specific Plan's model. *Id.* 19:26-20: ("The LEDPA reduces residential developable acres by about 369 acres and commercial acres by about 36 acres compared to the Specific Plan.") (citing AR 766:104287, 104305-06). Plaintiffs attempt to compare the Project's purpose to other project purposes that the has EPA elevated for review and deemed too restrictive. *See* Dkt. # 94 ["Pl.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

RJN I"], Ex. 3 ["Hartz Mountain Memo"]; Dkt. # 111 ["Pl. RJN II"], Ex. 4 ["Old Cutler Bay Memo"]. However, both of those other instances are distinguishable because the project purposes specified more particular information such as a particular number of units to be developed. *See Hartz Mountain Memo* at 7, 10 (stating that the "project purpose was to construct 3,301 units of residential housing" in a certain area was too narrow); *Old Cutler Bay Memo* at 7 (stating "specific numbers of units . . . is inappropriate for a statement of basic purpose"). Here, the record illustrates that the definition of the Project objectives and the way in which the Corps applied the objectives allowed for a wide range of environmental avoidance.

Because the Corps' definition of the Project purpose considered permissible factors and was not drawn so narrowly that it unreasonably precluded alternatives allowing for additional avoidance of impact to waters, the Corps did not violate the CWA by rejecting alternatives as impracticable for failure to satisfy the Project purpose.[7]

3.    Additional Floodplain Avoidance

Plaintiffs also assert that the Corps violated the CWA by failing to adequately evaluate the practicability of additional floodplain avoidance. *See Pl. Mot.* 16:26-17:27. Plaintiffs contend that the Corps took an all-or-nothing approach to avoiding the floodplains in the Project area – the Corps considered Alternative 7 that entirely avoided the floodplain but "did not consider any other alternative that would reduce or avoid elimination of the 100-year floodplain." *Id.*

At the outset, Newhall notes that floodplains are not, by definition, "waters" subject to the Corps' jurisdiction and the Corps has no authority to regulate activities in the floodplains. *See Newhall Opp.* (citing 33 C.F.R. § 328.3(a); 40 C.F.R. § 230.3(s)). The Corps' regulations nevertheless require the Corps, as part of its comprehensive public interest review, to consider floodplain impacts and avoid, minimize, and mitigate them to the extent practicable before issuing a permit. *See* 33 C.F.R. § 320.4(l). These regulations implement Executive Order 11988, which establishes a goal of minimizing adverse impacts to floodplains and losses from flooding. *Id.*; Exec. Order No. 11988, 42 Fed. Reg. 26,951.

Crucially, the Corps did consider a range of alternatives with varying impacts to the jurisdictional waters and their floodplains, with net impacts to the Santa Clara River's floodplain ranging from four acres under Alternative 7 to 157 acres under Alternative 5. *See Newhall Opp.*

---

[7] The Court notes that Alternatives 6 and 8 were also impracticable due to their high costs and higher impacts to water. *See* AR 766:104301-03; *Newhall Opp.* 20:25-21:2. As such, even under a broader statement of Project objectives, neither of these alternatives could have been the LEDPA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

14:13-19; AR 255: 30994 (Alt. 3), 31006 (Alt. 4), 31017 (Alt. 5), 31030 (Alt. 6), 31042 (Alt. 7). The alternative ultimately selected by the Corps – Modified Alternative 3 – has fewer impacts than any other alternative save Alternative 7, which the Corps found to be impracticable due to cost and project purpose considerations. *Newhall Opp.* 14:22-16:2. Modified Alternative 3 results in a net loss of approximately 110 acres of the floodplain out of the 1,408 total floodplain acres in the Project area. *See* AR 766:104328. Plaintiffs appear to make the very targeted assertion that the Corps should have analyzed an alternative that affected the 1400-acre floodplain to a greater degree than Alternative 7's four acres and to a lesser degree than Alternative 3's 110 acres. The Corps did not analyze floodplain impacts in a vacuum and it was not required to do so. The Corps considered five build alternatives that were designed to avoid varying amounts of wetlands and other waters of the U.S., endangered spineflower areas, and the floodplain as a part of a comprehensive public interest review. *See Def. Opp.* 10:11-15 (AR 766:104341-403). The Corps determined that the chosen alternative protects the largest amount of environmentally sensitive areas (the floodplain among other areas), while still being practicable. Plaintiffs have not demonstrated that the Corps failed to consider and avoid or minimize floodplain impacts to the extent practicable in light of other necessary Project considerations and objectives.

Based on the foregoing analysis, the Court concludes that the Corps' selection of Modified Alternative 3 as the LEDPA for the Project did not violate the CWA.

B.    Endangered Species Act

i.    *Framework*

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b). For species listed as threatened or endangered, the Secretaries of the Interior and Commerce will also designate a critical habitat. *Id.* § 1533(a)(3)(A). Each federal agency must ensure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" *Id.* § 1536(a)(2). In fulfilling this obligation, agencies are required to "use the best scientific and commercial data available." *Id.*

If an agency determines that its actions "may affect" a listed species or its critical habitat, the agency must consult with either the Fish and Wildlife Service ("FWS") within the Department of the Interior or the National Marine Fisheries Service ("NMFS") within the National Oceanic and Atmospheric Administration, depending on the species at issue. 50 C.F.R.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

§§ 402.01, 402.14(a)-(b).[8]  "'[A]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement.'"  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (quoting 51 Fed. Reg. 19,949; citing *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009)).  However, "if the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."  *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994); *see also Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996) (the agency's initial determination of "no effect on the Mexican Spotted Owl . . . obviates the need for formal consultation under the ESA").

To review whether an agency's "no effect determination was arbitrary and capricious, [the court] must decide whether the [agency] 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'"  *W. Watersheds*, 632 F.3d at 496 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).

   *ii. Analysis*

Plaintiffs argue that the Corps violated the ESA by failing to consult with the NMFS regarding the effects of the Project on the endangered Southern California steelhead trout and its critical habitat.  *Pl. Mot.* 19:19-26:5.  Specifically, Plaintiffs contend that the Corps should have consulted with the NMFS regarding the "cumulative sub-lethal toxicity effects" of the Project's discharges of stormwater containing dissolved copper on the steelhead and their critical habitat.  *Id.* 10:14-16.  The Corps responds that it had no obligation to consult with the NMFS because it determined that the Project would have "no effect" on steelhead trout or their critical environment, and that determination was not arbitrary or capricious because it was rationally drawn from information that the Corps deemed to be the best scientific data available for analyzing the Project's impacts on steelhead.  *See Def. Opp.* 16:26-28:9; *Newhall Opp.* 21:6-27:3.  Plaintiffs argue that the concentration of dissolved copper in the Project's stormwater discharge is at a level that "may affect" steelhead by causing cumulative sub-lethal toxicity impacts.  Defendants and Newhall respond that the Corps determined the Project's stormwater discharge will not contain copper at a level capable of affecting the steelhead.

   1. Background

Southern steelhead trout are listed as endangered under the ESA.  *PSGIF* ¶ 97.  While neither steelhead nor the species' critical habitat is found in the Project area itself, *see id.* ¶¶ 98-99, part of the critical habitat is located five miles downstream of the Project area, on the other

---

[8] The NFMS is responsible for administering and enforcing the ESA with respect to marine and anadromous species, such as the steelhead trout.  50 C.F.R. § 402.01(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|---------------|

| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* |
|-------|----------------------------------------------------------------------------------------------|

side of the Dry Gap in the Santa Clara River, *see id.* ¶ 100. *See also* AR 255:32352, 32354, 766:104386-87.

> 2.     Best Scientific Data Available

The ESA requires agencies to use the best available science when conducting their analyses. *See* 16 U.S.C. § 1536(a)(2). Because Plaintiffs and the Corps describe different sources of information as the "best scientific data available" to analyze the impact of the Project's copper discharge on steelhead, the Court first addresses whether the Corps acted arbitrarily and capriciously in selecting its "best data" source. The Court first notes that "[t]he determination of what constitutes the best scientific data available belongs to the agency's special expertise, and thus when examining such a determination, a reviewing court must generally be at its most deferential." *See Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) (internal quotations omitted); *see also San Luis*, 747 F.3d at 610 ("deference to agency determinations is at its greatest when that agency is choosing between various scientific models"). "Though a party may cite studies that support a conclusion different from the one the [agency] reached, it is not [the court's] role to weigh competing scientific analyses." *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009) (citations omitted); *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) ("To set aside the Service's determination in this case would require us to decide that the view of Greenpeace's experts have more merit than those of the Service's experts, a position we are unqualified to take."). Thus, a "plaintiff alleging that an agency did not use the best available science should be able to 'cite[] . . . scientific studies that indicate the [agency's] analysis is outdated or flawed' or 'scientific information directly undermining' the agency's conclusion." *Alliance for the Wild Rockies v. Kruger*, 950 F. Supp. 2d 1196, 1208 (D. Mont. 2013) (quoting *Ecology Ctr.*, 574 F.3d at 659-60).

In making its "no effect" determination, the Corps considered multiple scientific studies and literature addressing steelhead and the impacts of dissolved copper, including information and modeling specific to the Santa Clara River and the Project area itself. *See Def. Mot.* 46:11-15; *see* AR 255:30194, 31549-50, 31558-59 (2008 technical memorandum prepared by the consulting firm Geosyntec regarding water quality impacts associated with the approved Specific Plan); AR 766:104772-74 ("The LID Water Quality Analysis Results for RMDP Project Area Technical Memorandum (Geosyntec, 2011a) provides . . . data for Project-related effects to the concentration of dissolved copper . . ."); AR 512:54641 ("GSI Water Solutions, Inc. prepared a report that evaluated the 'Dry Gap' portion downstream of the Project area in a report entitled, Assessment of Future Surface Water Conditions in the Dry Gap of the Santa Clara River (April 2008)."). The Corps considered this data unique to the Project's precise location and development specifications to be the best scientific data available to evaluate the effect of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

Project on downstream steelhead or their critical habitat. *See Def. Opp.* 18:3-6.

The Corps considered but decided not to rely on another document – a 2007 NMFS Technical memorandum ("2007 Memo"). Plaintiff Ventura Coastkeeper submitted this document to the Corps in its comments on the Final EIS. *See* AR 577:64490-542 ("An Overview of Sensory Effects on Juvenile Salmonids Exposed to Dissolved Copper: Applying a Benchmark Concentration Approach to Evaluate Sublethal Neurobehavioral Toxicity").[9] Plaintiffs argue that this data source contained the "best scientific data" for evaluating steelhead impacts from the Project and thus the Corps should have relied on it in making its determination. *See Pl. Mot.* 24:15-25:2; *Reply* 13:19-51:21. This memorandum is important to Plaintiffs' ESA argument because it is the only source that supports their contention that dissolved copper at levels as low as 0.18 to 2.5 micrograms per liter ($\mu$g/L) can impart sub-lethal impacts to juvenile steelhead in the Santa Clara River, a showing central to Plaintiffs' argument that the Corps unreasonably determined that the Project's dissolved copper would not affect downstream steelhead. *See Pl. Mot.* 24:21-24; *Def. Opp.* 20:12-15. Because "[t]he best available data requirement merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on[,]" the Corps was only required to incorporate this finding into its analysis if the 2007 Memo was somehow superior to the Corps' other sources. *See Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (internal quotation omitted).

Plaintiffs have not demonstrated that the 2007 Memo was superior to the Corps' other sources that it relied on in reaching its "no effect" determination. Instead, the evidence actually suggests that the 2007 Memo was *inferior* to the other sources. First, the 2007 Memo is not specific to the Project, the Santa Clara River, or steelhead; rather, it discusses effects of dissolved copper on juvenile salmonids generally, ultimately deriving "benchmark contentions" using data from laboratory experiments. *See Def. Opp.* 19:3-13 (citing AR 577:64500, 514, 518, 520); *see also* AR 577:64500 (the 2007 Memo expressly states that it does not address the effects of dissolved copper on salmonid *habitats*); *Newhall Opp.* 25:5-11. Secondly, the NMFS itself did not rely on or cite the 2007 Memo in its 2009 Draft Southern California Steelhead Recovery Plan (AR 1043:134219-648) or the 2012 Final Southern California Steelhead Recovery Plan, thus suggesting that the NMFS did not consider the 2007 Memo the best source of information for specifically assessing impacts on steelhead in Southern California. *See Def. Opp.* 20:3-6; *Newhall Opp.* 25:18-24. On this record, the Corps did not act arbitrarily and capriciously when it determined that the 2007 Memo was not the best scientific data available to analyze the Project's impact on steelhead and their critical habitat.

---

[9] "Salmonid" refers to multiple species of trout and salmon, including steelhead trout. *See* AR 577:64507-08.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

3.      No Effect Determination

"[A]n agency's 'no effect' determination under the ESA must be upheld unless arbitrary and capricious." *W. Watersheds*, 632 F.3d at 481 (citing *Or. Natural Res. Council*, 476 F.3d at 1036. "Critical to that inquiry is whether there is 'a rational connection between the facts found and the conclusions made' in support of the agency's action." *Id.* (quoting *Or. Natural Res. Council v. Brong*, 492 F.3d 1120, 1131 (9th Cir. 2007)).

Using information that the Corps deemed to be the best scientific data available for this analysis, the Corps observed the following facts:

- The Project's segment (or reach) does not contain steelhead or steelhead habitat. AR 255:32352, 32354-56, 32363; AR 766:104386-87, 104542, 104779.

- Due to the Dry Gap downstream of the Project area in the Santa Clara River, the Project's stormwater will only reach the steelhead habitat during large storms. AR 512:54641; AR 766:104386-87; AR 1005:130605.

- At present, the Santa Clara River contains concentrations of dissolved copper that range from 3.3 µg/L to 22.6 µg/L. AR 766:104773. But during rainfall events significant enough to breach the Dry Gap and reach the steelhead critical habitat, the average concentration of dissolved copper in the River is 9.9 µg/L. AR 255:31499 (measurement after two-day precedent of more than one inch of rainfall); AR 766:104773-75.

- Stormwater discharged from the Project will only contain 6.5 µg/L dissolved copper. AR 766:104773; AR 676:101750.

Based on these findings, the amount of dissolved copper that may discharge in the Project's stormwater will be less than the amount of dissolved copper currently in the River during the relevant storm events. From these facts, Federal Defendants and Newhall argue that the Corps rationally concluded that the Project's stormwater discharge will not affect the downstream steelhead or their habitat because the Project's stormwater will add more water, and less dissolved copper, to the River's current flow during storms, thereby slightly decreasing the total amount of dissolved copper in the River through dilution. *Def. Opp.* 24: 10-24.

This specific "dilution" line of reasoning, comparing the Project's 6.5 µg/L dissolved copper stormwater discharge to the specific 9.9 µg/L dissolved copper existing condition figure, does not appear explicitly in the record. Rather, the Corps reasoned that the estimated dissolved

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|---------------|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

copper concentration is "within the range of observed concentrations in Santa Clara River Reach 5," referring to the wide 3.3 to 22.6 µg/L range. *See* AR 255:31558-59. The Corps explained:

> As depicted by Table 6,[10] the predicted concentration of dissolved copper in runoff from the Project site after the implementation of proposed project design features (PDFs) would be well within the range of concentrations observed within Reach 5 of the River under existing conditions. As a result, the originally proposed Project and alternatives would not result in a substantial change to existing dissolved copper concentrations . . . the originally proposed Project and alternatives would not substantially alter the existing concentrations of dissolved copper that currently exist in the Santa Clara River; and, therefore, the Project would not result in significant impacts to steelhead or other special-status fish species.

AR 766:104773. Although the Corps did not spell out how the Project's stormwater discharge would not increase the River's dissolved copper concentration during the relevant storm events specifically, that data was before the Corps and thus considered by the Corps when it drew its more summary conclusions. *See* AR 255:31499 (reporting a dissolved copper concentration of 9.9 µg/L in the River for "2-Day Precedent Rainfall of > 1 Inch").

 Plaintiffs' attempts to undercut the Corps' reasoning takes many forms. First, in an argument not asserted in Plaintiffs' motion for summary judgment, Plaintiffs contend that the Corps' analysis was flawed because it did not include the discharge of copper from the Project's wastewater treatment plant. *See Pl. Opp. to Def.* 14:18-15:9; *Pl. Opp. to Newhall* 15:5-13. Stormwater and wastewater are not the same. *See Def. Reply* 10:5-8 ("stormwater is water that drains from property during storm events, while wastewater is water used in homes and business, like in toilets and sinks, that is treated in a plant before discharge"). Plaintiffs are jurisdictionally barred from arguing that the Corps did not properly assess the effect of dissolved copper discharged from the Project's wastewater on steelhead because Plaintiffs did not raise this argument in their Notice of Intent to Sue ("NOI") the Corps required under the ESA. *See Rusk Decl.*, Ex. 1 at 10-14 ("NOI") (discussing the effect of stormwater discharge only); *Conservation Force v. Salazar*, 714 F. Supp. 2d 99, 103-04 (D.C. Cir. 2010) (dismissing plaintiffs' ESA claim because it went beyond the issues raised in the NOI). Moreover, the Corps did analyze the combined effects of stormwater and wastewater and the record reflects that the resulting concentration figure during relevant storm events would be somewhere below 9.0 µg/L, a figure still less than the 9.9 µg/L existing conditions marker. *See* AR 512:57008 (reaching the

---

[10] Table 6 lists the Project's 6.5 µg/L dissolved copper figure, the 3.3 to 22.5 µg/L range of observed concentrations in the River's Reach 5, and the California Toxic Rule criteria amount; it does not specify the 9.9 µg/L figure for existing conditions in that part of the River during storm events.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

9.0 µg/L figure); *see also Def. Reply* 11:2 n.4 ("An accurate projection would be lower than 9.0 µg/L, since the estimated level of dissolved copper in stormwater [used for that analysis] has decreased from 8.4 µg/L to 6.5 µg/L" as a result of August 2011 Low Impact Development ("LID") implementation) (citing AR 255:31556, 31559; AR 676:101744-51; 766:104773-75).

Plaintiffs also argue that the Corps' use of the 9.9 µg/L figure for its impact analysis is incorrect because it reflects an average and dissolved copper concentrations in the Santa Clara River are sometimes as low as 3.75 µg/L adjacent to the Project and as low as 5 µg/L downstream of the Dry Gap.  *See Pl. Opp. to Def.* 16:1-23; *Pl. Opp. to Newhall* 16:15-17:9. Federal Defendants and Newhall respond that it was reasonable for the Corps to conduct its impact analysis using averages, citing the EPA's use of averages in its CTR water quality standards as an example.  *See Def. Reply* 11:8-12:3; *Newhall Reply* 12:17-14:11.  The EPA's CTR water quality criteria defines permissible *average* levels of copper and other metals over periods of time.  *See* Fed.Reg. 31682, 31691 (May 18, 2000); 40 C.F.R. § 131.38.  The Corps chose to compare the *average* dissolved copper concentration from the Project to the existing *average* dissolved copper concentration in the River during the relevant storm events, and Plaintiffs have not demonstrated that it was unreasonable for the Corps to use this methodology.

Also, in their motion and on reply, Plaintiffs stress that it was improper for the Corps to determine that the Project's dissolved copper levels would have no effect on steelhead simply because they were below the CTR threshold of 32 µg/L because that threshold amount does not take into account "sub-lethal" impacts.  *Pl. Mot.* 25:6-26:5; *Pl. Reply I* 15:22-16:18; AR 766:104773.  While the Corps did note that the dissolved copper concentration levels were much lower than the CTR toxicity threshold, the Corps did not rely on that observation alone to determine that the Project would have "no effect" on steelhead or their habitat.  *See Def. Opp.* 22:9-23:8; *Newhall Opp.* 26:11-17; *see also* AR 766:104773 ("*Furthermore*, the predicted concentration of copper . . . would be substantially below California Toxic Rule thresholds . . .") (emphasis added).  Rather, as discussed above, a key observation was that the Project's stormwater discharge contained a lower dissolved copper concentration than that already existing in the Santa Clara River during the relevant storm events.

In Plaintiffs' final attempt to demonstrate that the Corps' steelhead impact analysis and conclusion was arbitrary and capricious, Plaintiffs abandon the "concentration" metric and argue that the Corps should have considered the "total *mass* of dissolved copper discharged by the Project during storm events."  *See Pl. Opp. to Def.* 15:10-22 (emphasis added); *see also Pl. Opp. to Newhall* 15:24-16:8.  Federal Defendants explain that mass is not the appropriate metric to measure the impact of dissolved copper because the process of dilution means that "[a]lthough the 'total mass' of dissolved copper in stormwater may increase, so will the amount of water,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

meaning the 'mass' of copper will actually be diluted to a concentration of 6.5 µg/L." *See Def. Reply* 12:8-12. Accordingly, the EPA's CTR criteria and even the touted 2007 Memo reflect that concentration, not mass, determines the potential for effects on aquatic life. *See* 40 C.F.R. § 131.38; *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009); *see also* AR 64492-542. Thus, Plaintiffs' argument that the Corps should have concluded that dissolved copper may affect the downstream steelhead habitat due to the *mass* of dissolved copper in the Project's stormwater discharge is without merit.

Plaintiffs fail to demonstrate that the Corps' "no effect" determination was arbitrary or capricious because the Corps' determination that the Project's dissolved copper discharge during storms would not affect steelhead or the steelhead critical habitat was drawn rationally from the factual findings before it.

C.    National Historic Preservation Act

i.    *Framework*

The NHPA does not prohibit harm to historic properties, but creates obligations "that are chiefly procedural in nature." *San Carlos Apache Tribe v. U.S.*, 417 F.3d 1091, 1097 (9th Cir. 2005) (citation omitted). The NHPA "is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs," but does not require that they reach particular outcomes. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citation omitted).

Section 106 of the NHPA requires federal agencies to "take into account the effect of [an] undertaking on any historic property" before issuance of any license. *See* 54 U.S.C. § 306108. The Advisory Council on Historic Preservation has promulgated regulations to govern federal agency compliance with section 106's directive. *See* 36 C.F.R. Part 800. First, agencies must "make a reasonable and good faith effort to identify historic properties" and "determine whether identified properties are eligible for listing on the National Register[.]" *Muckleshoot*, 177 F.3d at 805; 36 C.F.R. § 800.4(b). Secondly, agencies must "assess the effects of the undertaking on any eligible historic properties found." *Muckleshoot*, 177 F.3d at 805; 36 C.F.R. § 800.5. Third, agencies must "avoid or mitigate any adverse effects" identified in this process. *Muckleshoot*, 177 F.3d at 805; 36 C.F.R. § 800.6.

Relevant to the disposition of this motion, the regulations also require agencies to "consult" with "any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii). Accordingly, agencies "shall make a reasonable and good faith effort to identify any Indian tribes . . . that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties." *Id.* § 800.3(f)(2).

> ii.    *Analysis*

Plaintiffs contend that the Corps violated the NHPA by failing to consult with the Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation ("Santa Ynez Band" or the "Tribe"), a recently added plaintiff in this litigation. *Pl. Mot.* 41:1-46:4. According to a declaration submitted by Plaintiffs in support of their motion, the Santa Ynez Band is a federally-recognized Indian tribe with a Reservation located in Santa Barbara County. *See Armenta Decl.* ¶¶ 5-6.[11] The Santa Ynez Band is one of many bands that comprise the "Chumash Peoples" and is the only federally-recognized Chumash band in the United States. *Id.* ¶ 8. Although the Santa Ynez Band is currently located in Santa Barbara County, the "Chumash territory" at one time spanned from Malibu in Los Angeles County to Paso Robles in Santa Barbara County and inland. *Id.* ¶ 11. The declarant states that "[s]ince time immemorial, the Chumash Peoples, including the Santa Ynez Band [], have had a traditional cultural relationship with, and an ongoing interest in the places, sites, and things within and from the area . . . on the current site of Newhall Ranch[.]" *Id.* ¶ 12. Plaintiffs contend that the Corps violated NHPA because they did not consult with the Santa Ynez Band of the Chumash Indians in particular prior to issuing the Section 404 Permit.

Federal Defendants and Newhall counter that the argument fails for multiple reasons. First, Plaintiffs failed to exhaust their administrative remedies so that they could bring a claim on this ground because they did not sufficiently raise the issue of consulting with the Santa Ynez Band during the administrative process. Second, the Corps fulfilled its regulatory obligation by making a reasonable and good faith effort to identify interested tribes and that effort did not

---

[11] Federal Defendants and Newhall filed motions to strike the Armenta Declaration and the Waiya Declaration because these documents are extra-record materials. *See* Dkts. # 101, 104. The Court agrees that it is inappropriate to use these extra-record materials to analyze whether the Corps acted reasonably on the record before it; however, the Court finds it necessary to use the Armenta Declaration for the limited purpose of providing context for Plaintiffs' consultation argument because the administrative record does not contain any information about the Santa Ynez Band. *See Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 (it is proper to allow extra-record materials to explain technical terms or complex subject matter). Also, it is appropriate for the Court to consider these declarations for the purpose of establishing Plaintiffs' standing. *See Nw. Environmental Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527-28 (9th Cir. 1997). Accordingly, the Court DENIES the motions to strike, but limits the use of the declarations to the purposes of providing context regarding the subject matter of Plaintiffs' Santa Ynez Band argument and establishing the Tribe's standing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

identify the Santa Ynez Band.  Lastly, Plaintiffs have not demonstrated that the Santa Ynez Band has an interest in anything located in the Project area or that it is prejudiced by the Corps' failure to consult with it.

      1.     Exhaustion of Remedies

"As a general rule, [courts] will not consider issues not presented before an administrative proceeding at the appropriate time."  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2009) (quoting *Marathon Oil Co. v. U.S.*, 807 F.2d 759, 767-68 (9th Cir. 1986)).  "[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."  *U.S. v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004) (respondents forfeited their objections to an Environmental Assessment when they did not raise them in their comments).

This exhaustion requirement is "interpreted broadly."  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2009).  To properly "present" an issue to an agency, "[p]laintiffs need not state their claims in precise legal terms, and need only raise an issue 'with sufficient clarity to allow the decision maker to understand and rule on this issue raised[.]'"  *Id.* (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 968 (9th Cir. 2006)); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002) ("The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged.") (citation omitted).  However, "[c]omments must be significant enough to step over a threshold of materiality before any lack of agency response or consideration becomes of concern."  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (internal quotation omitted).  A party cannot "mak[e] cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seek[] to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"  *Id.* at 553-54.

Newhall and Federal Defendants argue that the one place in the record to which Plaintiffs can point and claim that the Corps was on notice of the Santa Ynez Band's interest in the Project or the Corps' obligation to consult with Tribe did not raise the issue with sufficient clarity to allow the Corps to understand and act on or respond to the issue.  *See Newhall Opp.* 27:15-28:13; *Def. Opp.* 43:26-45:12 (describing the concept as "waiver" of the argument).  Plaintiffs respond that they were not required to exhaust administrative remedies and, if they were so

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|---------------|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

required, they sufficiently raised the issue of consultation with the Santa Ynez Band. *See Pl. Reply II* 6:8-8:2.

Plaintiffs correctly note that "[w]hile actions brought under the Administrative Procedures Act normally require exhaustion of all administrative remedies, there are 'exceptional circumstances where exhaustion may not be required.'" *Id.* 6:14-18 (quoting *White Mountain Apache Tribe v. Hodel*, 840 F.2d 675, 677 (9th Cir. 1988). However, Plaintiffs' claim that such an exceptional circumstance excusing the Tribe from exhausting administrative remedies arose because the Tribe was "never made aware of the project or its potential impacts" is unsupported by the law and the record. *See id.* 6:22-7:3. *White Mountain Apache* explains that "futility" can be an exception, "[f]or example, administrative review may be futile by virtue of a preannounced decision by the final administrative decision-maker" or "objective and undisputed evidence of administrative bias [may] render pursuit of an administrative remedy futile." *White Mountain Apache*, 840 F.2d at 677-78 (citations omitted); *see also Watkins v. U.S. Army*, 875 F.2d 699, 705 (9th Cir. 1989) (en banc) (finding exhaustion of effective intraservice remedies where further pursuit would have been "fruitless"). Courts have also suggested that the exhaustion requirement is subject to the equitable principles of "waiver, estoppel, and equitable tolling." *See Pl. Reply II* 6:18-7:3 (citing *Frederique-Alexandre v. Dep't of Natural & Envtl. Res.*, 478 F.3d 433, 440 (1st Cir. 2007)).

The Court is skeptical that a plaintiff can avoid its obligation to exhaust administrative remedies if the agency did not specifically alert or inform the plaintiff of the action at issue at an earlier time. The concepts of utility, waiver, and estoppel do not encompass that circumstance and Plaintiffs do not cite any cases in which courts endorse a version of "equitable tolling" in this "no notice" context.[12] Moreover, the record indicates that the Corps did publicize the Project and permit approval process such that interested parties would have been aware of their opportunity (and obligation) to raise relevant issues during the administrative process. *See Def. Reply* 17:15-18:11. The Project is a large-scale endeavor that Plaintiffs themselves describe as "one of the largest single residential developments ever contemplated in California." *See Pl. Mot.* 2:7-8. The Corps issued several public notices about the Project approval process, including in the Federal Register, which the Ninth Circuit has described as "notice to the world." *See PSGIF* ¶ 17; *Shiny Rock Mining Corp. v. U.S.*, 906 F.2d 1362, 1364-65 (9th Cir. 1990) ("Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance" in the statute of

---

[12] *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991) mentions that the plaintiff's views were solicited during the administrative process but does not reason or hold that the lack of solicitation would have constituted "exceptional circumstances" excusing the plaintiff's failure to first raise its issues during the administrative process. *Havasupai*, 943 F.2d at 34 (citing *Vt. Yankee*, 435 U.S. at 553-54).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

limitations context) (quotation omitted); *Gov't of Guam v. U.S.*, 744 F.2d 699, 701 (9th Cir. 1984) (holding that publication in the Federal Register "constituted formal notice to the world . . . "). The EIS was available in public libraries, on the CDFW's and the Corps' websites, and at those agencies' offices, *see* AR 255:30140, 30614; AR 510:53824; AR 512:53827, and the Corps published notice of the EIS in the Daily News Los Angeles and the Signal (a daily newspaper in Santa Clarita), *see* AR 543:63861; AR 544:63863. Further, Plaintiff Wishtoyo Foundation, like the Santa Ynez Band, is a Chumash organization and it was aware of the Project for years. *See* AR 96:28896-922; AR 568:63923-36. Against this responsible record of publication, the Court cannot conclude it is appropriate to excuse the Santa Ynez Band's failure to exhaust its administrative remedies on equitable grounds due to insufficient notice, even if the courts recognized such an exception.

Accordingly, Plaintiffs were required to exhaust their administrative remedies by bringing the Santa Ynez Band's interest in the Project before the Corps prior to filing this lawsuit under the APA.

Plaintiffs contend that, if they were required to bring the Santa Ynez Band's interest in the Project area to the Corps' attention during the administrative process, they did so in a scoping comment letter from Plaintiff Wishtoyo Foundation to the Corps submitted in 2004 ("2004 Scoping Letter"). *See Pl. Reply II* 7:4-8:2. The Court has carefully reviewed this letter and the arguments regarding its interpretation proffered by Plaintiffs, Newhall, and Federal Defendants and concludes that the letter's ambiguous reference to the Tribe was not clear enough to put the Corps on notice of the Santa Ynez Band's potential interest in the Project area or Plaintiffs' contention that the Corps should consult with the Tribe.

The 2004 Scoping Letter is a 27-page document signed by an attorney at the Environmental Defense Center containing comments submitted on behalf of nine entities that "form a coalition of public interest organizations dedicated to conserving and restoring the Santa Clara River and its natural resources." AR 96:28896-922. The logos for all nine entities appear on the document's letterhead. AR 96:288968. The Wishtoyo Foundation is one of the entities. *Id.* The Wishtoyo Foundation is a non-profit organization in Ventura County dedicated to preserving, protecting, and restoring Chumash culture, but that information does not appear in the 2004 Scoping Letter. *See* AR 576:64215 (information contained in the Wishtoyo Foundation's FEIS/FEIR Comments submitted in 2010). Page 26 of the 2004 Scoping Letter, under the "Cultural Resources" heading, contains the following:

There should be consultation with the Native American Heritage Commission, the federally recognized Tribe, local Gabrielino-Tongva and Chumash tribes and leaders, and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

there should be individual review of cultural resources in compliance with Section 106 of the Historic Preservation Act.

AR 96:28921. The capitalized "Tribe" or "federally recognized Tribe" is not defined or referenced anywhere else in the letter. Plaintiffs' argument is that because the 2004 Scoping Letter was submitted in part by the Wishtoyo Foundation, a Chumash organization, and the Santa Ynez Band is the only federally recognized Chumash band in the United States, this singular sentence sufficed to raise the issue of the Santa Ynez Band's potential interest in the Project area and the Corps' obligation to consult with the Tribe. *See Pl. Mot.* 41:27-42:8; *Pl. Reply II* 7:4-8:2. The Santa Ynez Band is never mentioned by name in the record and no other reference to a federally recognized tribe or the federally recognized Chumash tribe ever appears in the record, despite the Wishtoyo Foundation's continued participation in the public comment process. *See, e.g.*, AR 568:63923-27; AR 576:64215-27. The Court concludes that the 2004 Scoping Letter did not raise the issue of the Santa Ynez Band's interest in the Project area or the Corps' obligation to consult with the Tribe "with sufficient clarity to allow the decision maker to understand and rule on this issue raised[.]" *See Nat'l Parks*, 606 F.3d at 1065 (quotation omitted).

On its face, it is not apparent that "the federally recognized Tribe" is Santa Barbara County's Santa Ynez Band of Chumash Mission Indians. The "Tribe" is never defined and the context surrounding its reference is suggestive either that the Tribe is different than the "local Gabrielino-Tongva and Chumash tribes and leaders" referenced immediately afterwards or that the Tribe is the federally recognized affiliate of the local Gabrielino-Tongva and Chumash tribes. *Compare Newhall Reply* 17:15-19 (the letter "distinguishes 'the federally recognized Tribe' from 'Chumash tribes and leaders,' suggesting the federally recognized Tribe is *not* Chumash at all"); *with Pl. Reply II* 7:26 (the "argument that Wishtoyo's request could have been referring to *any* of the 150 tribes in California, or *any* of the 15 tribes within 150 miles of the Project site, is absurd, particularly in light of the comment's mention of 'Chumash tribes and leaders' *in the same sentence*"). Further, the source of the 2004 Scoping Letter does not render it evident that the "federally recognized Tribe" referred to the federally recognized *Chumash* tribe because the Chumash-interested Wishtoyo Foundation was only one of the nine entities sponsoring the comments and the letter itself never conveyed that the Wishtoyo Foundation was a Chumash organization. The Court concludes that this ambiguous reference to "the federally recognized Tribe" did not clearly notify the Corps of the Santa Ynez Band's potential interest in the Project area or a request that the Corps should consult with that particular tribe.

      2.      Reasonable and Good Faith Effort

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

Moreover, regardless of Plaintiffs' failure to properly raise this issue before the Corps during the administrative process, the Corps satisfied its obligations under NHPA because it made a "reasonable and good faith effort to identify any Indian tribes . . . that might attach religious and cultural significance to historic properties in the area of potential effects" and did not identify the Santa Ynez Band; therefore, the applicable regulation did not require consultation with the Santa Ynez Band. *See* 36 C.F.R. § 800.3(f)(2).

In 2004, the Corps contacted the Native American Heritage Commission ("NAHC"), the official "trustee" agency for Native American affairs in California, and requested "a list of appropriate Native American contacts for a stream alteration project within the County of Los Angeles" including "[g]roups and individuals that are listed by the NAHC as contacts for Los Angeles County." *See* Cal. Pub. Res. Code §§ 21070, 5097.91-98; AR 421:53215; AR 111:28972. The NAHC maintains lists of tribes and individual Native Americans who should be consulted for purposes of identifying historic properties on lands proposed for development. *See* AR 112:28974; AR 405:53137; AR 766:104311-13. The NAHC responded with a list of potentially interested and knowledgeable parties, including individuals and organizations attached to various Tataviam and Chumash Native American bands, but did not include the Santa Ynez Band. AR 112:28974-75. The NAHC recommended that the Corps contact each listed party, and the Corps did so. *Id.*; *Newhall Opp.* 29:25-30:3 (citing record). In 2009, the Corps contacted the NAHC for a second time, requesting a contact list for the Project area, *see* AR 405:53136-38, and received a list with the same names as before, plus the Fernandeño Band of Mission Indians, *see* AR 421:53215-17. The Corps contacted this band. *See* AR 104:28957-61; 119:29008-19. Throughout this process, the record does not show that any contact mentioned the Santa Ynez Band.

Plaintiffs contend that the Corps' identification effort with the NAHC was inadequate because the Corps unreasonably constrained its request to contacts within Los Angeles County, resulting in a "truncated" set of Native American contacts. *See Pl. Reply II* 3:13-22. However, the Corps did not limit its request to contacts "in" Los Angeles County, rather, the Corps requested contacts "for" Los Angeles County, meaning contacts interested in or with knowledge of Native American interests in the county in which the Project was located. *See* AR 111: 28972. The NAHC evidently shared this understanding of the request because two of the five contacts on the resulting list were outside of Los Angeles County. *See Def. Opp.* 19:22-20:10; AR 112:28975. Also, contrary to Plaintiffs' assertion, the NAHC did not instruct the Corps that the list was "just a starting place for the Corps' identification of tribal contacts," *see Pl. Opp. to Newhall* 24:10; rather, the NAHC stated that the list was a "starting place in locating *areas of potential adverse impact* within the proposed project area," *see* AR 112:28974 (emphasis added). Accordingly, it was not unreasonable for the Corps to contact the listed persons and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

entities then follow up on their responses and leads. Again, none of the contacts mentioned the Santa Ynez Band.

The Corps also sought assistance from the California State Historic Preservation Officer ("SHPO"), an individual tasked with assisting federal agencies with NHPA compliance. *See* 36 C.F.R. § 800.2(c)(1)(i); AR 167:29221-64; AR 168:29265-71; AR 175:29306-08; AR 518:63806-11; AR 592:64990-81. The SHPO did not advise the Corps to contact the Santa Ynez Band.

These efforts by the Corps were reasonable and conducted in good faith. Plaintiffs claim that references to "Chumash" interests or people generally should have alerted the Corps to contact the Santa Ynez Band in Santa Barbara County to inquire about its interests, but there was no information in the record or guidance from knowledgeable persons or entities (other than the 2004 Scoping Letter already discussed) that indicated that particular band of Chumash held any interests in the Project area. *See Pl. Reply II* 4:3-7, 4:25-5:9; *Def. Reply* 21:23-22:23; *Newhall Reply* 21:21-24. Lastly, Plaintiffs' assertion that the Corps could have done more by following all of the guidance in ACHP's reference handbook or consulting with other Corps offices or "sister agencies" in the identification process does not render the process that the Corps did carry out unreasonable. *See Pl. Reply II* 4:13-24. The Corps' efforts were reasonable, conducted in good faith, and did not identify the Santa Ynez Band as a tribe that might attach religious and cultural significance to anything in the Project area; thus, the Corps did not violate the NHPA by not consulting with the Tribe.

In light of the Court's conclusions regarding Plaintiffs' failure to exhaust their administrative remedies necessary to bring the Santa Ynez Band consultation issue before the Court and, additionally, that the Corps was not required to consult with the Tribe, the Court does not reach the parties' additional argument concerning whether the Tribe was prejudiced by the Corps' failure to consult with it prior to issuing the Section 404 Permit.

        D.    <u>National Environmental Protection Act</u>

        i.    *Framework*

Congress enacted NEPA to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; [] also [to] guarantee[] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Like the NHPA, "NEPA does not provide substantive protections, only procedural ones – it 'exists to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

ensure a process.'" *Conservation Cong.*, 774 F.3d at 615 (quoting *The Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008) (en banc)); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (NEPA does not "mandat[e] that agencies achieve particular substantive environmental results").

When an agency proposes any "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), NEPA requires preparation of an EIS in which the agency must examine: (1) the environmental impacts of the proposed action; (2) any adverse environmental effects of the action that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local, short-term uses of the environment and the enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources which would be involved. 42 U.S.C. § 4332(C). "The EIS 'shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'" *Conservation Cong.*, 744 F.3d at 616 (quoting 40 C.F.R. § 1502.1).

Judicial review "is limited to whether the EIS contains 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Natural Res. Def. Council, Inc. v. U.S. Dep't of Transp.*, 770 F.3d 1260, 1271 (9th Cir. 2014) (*quoting City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997)). The EIS must discuss direct, indirect, and cumulative impacts from a project. *See* 40 C.F.R. §§ 1502.16, 1508.8(b). If the EIS identifies a significant effect, it must evaluate "all reasonable alternatives" and analyze "appropriate mitigation measures." *Id.* § 1502.14. "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, our review is at an end." *Carmel-by-the-Sea*, 123 F.3d at 1151 (citation omitted).

  *ii.*  *Analysis*

Plaintiffs argue that the Corps' EIS was insufficient in three respects: (1) it failed to analyze the "sub-lethal impacts of the Project's stormwater discharges of dissolved copper" on "juvenile steelhead smolt," *see Pl. Mot.* 28:21-31:27; (2) its traffic analysis contained false and misleading information, *id.* 32:1-35:27; and (3) its analysis of impacts on Chumash natural cultural resources was inadequate, *id.* 36:1-39:14. Because NEPA only provides procedural protections, not substantive ones, Plaintiffs' arguments under NEPA cannot contend that the result of the Corps' analysis was wrong, only that the process was somehow flawed or insufficient in violation of the statute. *See Conservation Cong.*, 774 F.3d at 615; *Marsh*, 490 U.S. at 371 (NEPA does not "mandat[e] that agencies achieve particular substantive environmental results").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|----------------|

| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* |
|-------|--------------------------------------------------------------------------------------------------|

1.    Steelhead Impact Analysis

Plaintiffs contend that because the sub-lethal impacts of the Project's discharge of dissolved copper on steelhead downstream of the Dry Gap are reasonably foreseeable and potentially significant, the Corps was required to conduct a reasonably thorough impact analysis on this issue, but failed to do so. *Pl. Mot.* 29:11-19; 30:13-31:27.  Newhall accurately explains that "Plaintiffs' NEPA claim essentially repeats their ESA arguments regarding the Project's alleged sub-lethal effects on juvenile steelhead.  The only twist is that Plaintiffs also contend the EIS failed to adequately assess those alleged effects." *See Newhall Opp.* 45:22-25.  As discussed in the Court's analysis of the ESA claim, the Corps thoroughly analyzed the Project's potential impacts on steelhead downstream of the Dry Gap and reasonably concluded based on multiple studies representing the best available science that the Project would have "no effect" on steelhead.  *See also Def. Opp.* 28:17-30:12.  This analysis and conclusion encompassed an analysis of "sub-lethal impacts" that could result from dissolved copper concentrations below the CTR threshold levels because the Corps observed that the concentration in the Project's discharge would be lower than existing conditions during storm events.  In this assessment, the Corps' treatment of the 2007 Memo – acknowledging it but determining that it was not the best available science – was reasonable.  The Court thus concludes that the Corps took a "hard look" at the Project's potential impacts on steelhead, including sub-lethal impacts, in accordance with NEPA.  *See Carmel-by-the-Sea*, 123 F.3d at 1151.

2.    Traffic Impact Analysis

Section 4.8 of the EIS, the traffic analysis section, assesses potential significant impacts to traffic and access associated with the Project over 113 pages.  *See* AR 512:55463-75.  Plaintiffs identify three alleged defects or insufficiencies with the traffic analysis in the EIS: (1) misrepresentation of non-local use of Interstate 5 ("I-5"); (2) deceptive use of a "tripends" figure to overestimate on-site traffic; and (3) incorrect employment assumptions.  *See Pl. Mot.* 32:1-35:27.

Plaintiffs claim that the EIS misrepresents non-local use of I-5 because the EIS states that "approximately ten percent" of the Project's non-local (outside of the Santa Clarita Valley) traffic would "utilize I-5 for travel to and from the Santa Clarita Valley." *See Pl. Mot.* 32:5-7 (citing AR 512:56002).  However, this assertion is contradicted by the single study cited in support of it because the study concludes that nearly *all* such traffic would utilize I-5 because it "is the only viable option for north-south travel in and out of the Santa Clarita Valley." *Id.* 32:7-10 (citing AR 255:50152).  Plaintiffs contend that this unfounded assumption regarding the extent of non-local use of I-5 results in the EIS significantly underreporting traffic impacts and skewing alternatives analysis such that the Corps and the public were unable to make the "well-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

informed and reasoned decision" that NEPA requires. *Id.* 32:20-33:17. In response, Federal Defendants and Newhall explain that Plaintiffs misread the context of the "ten percent" figure and that the EIS and its traffic modeling do comport with the study's finding regarding I-5 use. *See Def. Opp.* 32:2-15; *Newhall Opp.* 42:5-43:9. The "ten percent" statement actually read: "approximately ten percent of total Project traffic were [sic] estimated to utilize I-5 for travel to and from the Santa Clarita Valley." *See* AR 512:56002. Thus, the EIS assumed that ten percent of total Project traffic, not ten percent of non-local traffic, would use I-5 (those traveling to and from locations outside the Valley). This statement is consistent with the cited study – ten percent of total Project traffic will be for trips in and out of the Valley, and all of those trips will use I-5. *See Newhall Opp.* 43:1-8. Plaintiffs appear to concede their misreading in their reply brief. *See Pl. Reply II* 13:24-27.

In reply, Plaintiffs counter that their "'misreading' is irrelevant" and "[w]hat *is* relevant is that the Corps provides no support for its conclusion regarding I-5 usage, and that this conclusion was contradicted by supporting documentation on the record that suggests a large percentage of project-related traffic will use the I-5." *See id.* 13:26-14:2 (emphasis in original). The reformatted argument is that the Corps failed to supply the underlying data to support its estimate that only ten percent of Project traffic will involve leaving or entering the Valley. *Id.* 14:3-15:8. The EIS's trip distribution patterns were determined using the Santa Clarita Valley Consolidated Traffic Model ("SCVCTM"), "a computerized demand model that utilizes a sophisticated trip distribution function to derive geographically defined travel patterns from zonal trip generation estimates calibrated according to local conditions." *See* AR 521:56000. The SCVCTM Report was included in the Final EIS. *Id.* The Corps explained how County and City personnel oversee the data inputted into the model based on local land use data or other specifically approved data. *Id.* This model then uses trip distribution functions used by the Southern California Association of Governments for regional traffic modeling efforts that have been "calibrated to real-world conditions." AR 512:56001. "As such, the trip distribution patterns reported in the proposed Project's traffic study were not 'assumed,' but were derived by a systematic methodology consistent with other traffic studies[.]" *Id.* The EIS plainly took a hard look at traffic impacts on I-5 through its in-depth traffic studies. *See* AR 512:55363.

If Plaintiffs were not satisfied with the level of detail disclosed regarding land use data and other data underlying the Corps' traffic modeling, they should have raised this issue during the administrative process so that the Corps had the opportunity to respond and provide additional information prior to this judicial challenge. *See, e.g., Pac. Coast Fed'n of Fisherman's Ass'ns v. U.S. Dep't of Interior*, 996 F. Supp. 2d 887, 905-06 (E.D. Cal. 2014) (an argument cannot proceed during litigation if it was not raised specifically enough during the administrative process to ensure the agency is on notice of the objection so that it has a chance to resolve it) (citing *Great Basin*, 456 F.3d at 965). The Corps' I-5 traffic impacts analysis was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

sufficiently thorough and transparent to satisfy NEPA. Furthermore, Plaintiffs have not demonstrated that the raw data underlying the model was unavailable and cannot now claim that they required more information underlying the model that they did not seek during the administrative process.

Plaintiffs' second traffic-related argument is that the EIS uses confusing "trip" versus "tripend" terminology to conclude that 47 percent of trips would remain "internal" to the Project. *See Pl. Reply II* 15:19-21. Plaintiffs do not argue that the EIS *misapplies* its chosen terminology; rather, Plaintiffs argue that the terminology is misleading and not thoroughly explained, thus making it appear to readers of the EIS that there are more internal trips than there actually are. *Id.* 15:15-16:5 (there is a "potential for confusion from the Corps' use of this unclear, unintuitive trade metric"). Plaintiffs' root issue with the tripend terminology is that calculating internal trips based on tripends inflates the figure in a way that readers will not understand; therefore, they will not appreciate the true import of the data and make informed decisions on that basis.

The EIS states that 47 percent of all Project trips will remain within, or be "internal" to, the Project site, while 53 percent of all Projects will be "external" to the site. *See* AR 512:55393. The EIS calculates this internal-to-external trip ratio using "tripends generated by the Project attributable to trips beginning or ending on the Project site." In the Corps' topical response to comments on the EIS, the Corps further explains:

> A tripend is the beginning or ending of a trip. For example, a trip from home to work has two tripends. By contrast, a "trip" refers to the journey between the origin tripend and the destination tripend. Thus, a journey from home to work has two tripends but constitutes only one trip.

AR 512:55393. The location of this response is also indicated in the main body of the EIS and this explanation makes clear the distinction between a "trip" and a "tripend" so that it would be "readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected by actions taken under the EIS." *See Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 494 (9th Cir. 1987). Although calculating the internal-to-external ratio using "trips" versus "tripends" yields percentage numbers that may evoke different initial reactions from readers, the Corps selected a methodology, conducted a thorough analysis, and explained how it reached its conclusions using clearly defined "tripend" inputs. The Corps also specifically considered the issue of whether the internal capture rate of 47 percent was overstated during the administrative process and explained its basis. *See Def. Opp.* 34:10-21 (citing AR 512:56003-04). Moreover, the Corps actually discloses the internal-to-external ratios based on both "Project Tripends" analysis and "Project Trips" analysis side-by-side in its topical response to EIS comments:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

**Table 1**
**Alternative 2 (Proposed Project) Tripend and Trip Summary**

| Trip Type | Project Tripends | Percent of Total Project Tripends | Project Trips | Percent of Total Project Trips |
|---|---|---|---|---|
| Internal | 192,632 | 47%[2] | 96,316 | 31% |
| External | 216,086 | 53% | 216,086 | 69% |
| Total | 408,718[1] | 100% | 312,402 | 100% |

[1] Draft EIS/EIR **Appendix 4.8**, 2008 Traffic Analysis, p. A-6 (Alternative 2 total ADT).

[2] Draft EIS/EIR **Appendix 4.8**, 2008 Traffic Analysis, p. 22 (Alternative 2 internal capture percentage).

Notes:

Each internal Project trip consists of two internal Project tripends (1 Project trip = 2 Project tripends).

Each external Project trip consists of one internal Project tripend and 1 external tripend (1 Project trip = 1 Project tripend).

AR 512:56001. The EIS's level of analysis and transparency regarding the internal-to-external ratios is consistent with the Corps' obligations under NEPA.

Lastly, Plaintiffs contend that the EIS's traffic analysis violates NEPA because it uses incorrect employment assumptions to justify high "internal trip capture assumptions." *See Pl. Mot.* 34:8-35:27. Plaintiffs claim that the EIS assumes that a "range of local low-skill, low-wage service and industrial jobs will provide a 'major source of employment for [Project] residents'" but elsewhere concedes that 78 percent of employment-related trips originating on-site will be for off-site employment while over 70 percent of people working on the Project site would come from off-site. *See id.* 34:12-16 (citing AR 512:5539, 56002, 56004). Plaintiffs protest that "this concession fundamentally altered one of the EIS's base assumptions for traffic volume and trip distribution" but the EIS's analysis and conclusions were never revised accordingly. *Id.* 34:16-20. Federal Defendants and Newhall explain that there is no inconsistency on this point in the EIS because Plaintiff created the alleged "concession" by altering a quote from the EIS. *See Def. Opp.* 35:19-36:24; *Newhall Opp.* 44:14-45:19. Plaintiffs represent that the EIS claimed that a range of local low-skill and industrial jobs will provide "a major source of employment for [Project] residents," but the EIS actually states that a portion of the Project will be "a major source of employment for Specific Plan *and other area residents*," not Project residents specifically. *Compare Pl. Mot.* 34:10-12, *with* AR 512: 55393 (emphasis added). This statement is consistent with the Corps' other statements regarding the majority of Project residents working off-site and the majority of people working on the Project site coming from off-site. Nothing in the EIS suggests that the traffic analysis was not conducted according to these calculations and assumptions, and Plaintiffs abandon their employment assumptions argument in their reply brief. *See Pl. Reply II* 13:21-17:2. There is no NEPA violation on this ground.

**CIVIL MINUTES - GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

3.      Chumash Natural Cultural Resources Impact Analysis[13]

Plaintiffs' arguments regarding insufficient analysis of the Project's impacts on Chumash natural cultural resources take three forms: (1) failure to analyze the impact on the Chumash Peoples' ability to harvest "River Rock" from the Santa Clara River; (2) failure to consider mitigation measures specifically attuned to Chumash interests; and (3) failure to consider mitigation measures that "commit" to avoidance or preservation of cultural places and resources. *See Pl. Mot.* 36:1-39:14.

The argument pertaining to River Rock fails because NEPA only requires the Corps to take examine "important" or "significant" impacts, and the record reflects that the EIS evaluated River Rock in proportion to the significance of the issue as it was presented to the Corps during the administrative process.  *See Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (An agency's "decision to implement a project is arbitrary and capricious under NEPA if an EA or EIS 'entirely failed to consider an important aspect of the problem.'  However, the [agency] is only required to focus on the issues 'that are truly significant to the action in question.'" (quoting *Lands Council*, 537 F.3d at 987; 40 C.F.R. § 1500.1(b))); *see also* 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance.").

The issue of the Project's impact to the Chumash Peoples' ability to collect River Rock from the Santa Clara River was mentioned without particular emphasis in a single comment letter.  Chumash Ceremonial Elder and Wishtoyo Foundation founder Mati Waiya ("Waiya") submitted a five-page comment letter (the "Waiya Letter") in response to the Final EIS regarding the impacts on Chumash cultural resources.  AR 568:63923-27.  The letter is divided into three sections addressing "Impacts to Burial Sites and Cultural Resources," "Cultural Impacts [] on the California Condor," and "Impacts to Chumash Cultural Landscape."  *Id.*  The cultural landscape section begins:

> In modern times, when Chumash access the Santa Clara River upper watershed to honor our ancestors and to harvest: willow for traditional dwelling units (aps); soap stones for ceremonial beads, pipes, and bowls; river rocks for ceremonial sweats, and white sage from the riverbanks for ceremonial blessings, we immerse ourselves in our cultural landscape, which must remain in tact [sic] to preserve our culture.

AR 512:63926.  Waiya describes the cultural landscape as inclusive of wildlife, hillsides, the River, creeks, mountains, valleys, and ancestors' remains and shares a story about performing a ceremony in the Project area in the midst of the untouched cultural landscape.  *Id.*  Waiya

---

[13] In this section, Plaintiffs refer to the Chumash People generally, not to the Santa Ynez Band of Chumash Mission Indians.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

concludes that he fears development will foster unwanted access to Native American cave paintings and sacred burial sites, and that the "dredging of the Santa Clara River floodplain[] will also eliminate sacred harvesting locations for white age, soap stones, river rock, and willow." AR 512:63926-27.

The Corps responded to the issues raised in the Waiya Letter in seven pages of official comment. *See* AR 766:104691-97. The Corps' responsive analysis considers each of Waiya's primary arguments in turn in three sections – 2.1 (Burial Sites and Cultural Resources), 2.2 (the Condor), 2.3 (Cultural Landscape) – and fairly addresses the impacts that Waiya stressed as significant. *Id.* Although the Corps' Cultural Landscape section does not reference river rock harvesting specifically, it does reason that "[a]s the Santa Clara River Corridor would be substantially avoided, the cultural landscape of various Native American tribes would be preserved" and summarizes its efforts to avoid impacts to waters. *See* AR 766:104696-97. In response to a comment letter that mentions River Rock harvesting among other activities and does not provide any details regarding the Project's feared impact, such as specific locations that might be affected, the Corps' overarching response was appropriately tailored to the specificity and significance of the River Rock issue as it was presented to the Corps.

Further, the Court is aware that when "determining whether the EIS contains a 'reasonably thorough discussion,' [it] may not 'fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies[.]'" *See Friends of the Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (quoting *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996)). The Court concludes that it would be "fly-specking" if the Court was to vacate the EIS for not responding to the Waiya Letter by specifically addressing whether and how the Chumash Peoples could harvest River Rock from the Santa Clara River.

Plaintiffs also attempt to challenge the EIS's cultural resource mitigation measures using NEPA. *Pl. Mot.* 37:20-39:14. The mitigation measures described in the EIS include the condition that the Tataviam, an historic Native American tribe that once inhabited the Project area, will "provide monitoring and consulting services" by using "its special expertise relating to matters of Native American heritage and interest, and act[ing] as a liaison between the Native American community, archaeologists, developers, contractors, and public agencies." AR 512:55516-18. In their motion, Plaintiffs argue that the mitigation measures are flawed because they only provide for Tataviam monitors to identify and assist with mitigation of uncovered cultural resources and contend that the "failure to include participation of Chumash monitors in mitigations measures CR-3 and CR-5 violates NEPA[.]" *See Pl. Mot.* 37:20-25, 38:25-39:3. First, this argument is flawed because NEPA does not require the Corps to adopt any particular mitigation measures at all, only to discuss mitigation measures. *See Newhall Opp.* 39:23-26 (citing *Robertson*, 490 U.S. at 351-53 ("There is a fundamental distinction, however, between a

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|---|---|---|---|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated . . . and a substantive requirement that a complete mitigation plan be actually formulated and adopted" and NEPA requires the former). Plaintiffs implicitly realized the faulty phrasing of their argument in their reply brief and reformatted the theory as a failure to "analyze" whether Chumash input was needed or to "explain" the Corps' "apparent belief that Chumash monitors are not necessary[.]" *Pl. Reply II* 11:11-20.

Plaintiffs do not establish a NEPA violation even under this rearticulated argument. By analyzing how to appropriately mitigate impacts to cultural resources in the Project area and explaining how its selected mitigation measures adequately protected cultural resources on the Project, the Corps necessarily reasoned that Chumash monitors (and countless other variations of mitigation measures) were not necessary to adequately mitigate impacts to cultural resources. The Tataviam are not acting as a monitor to protect Tataviam resources only; they are providing monitoring and consulting services using their "special expertise relating to matters of Native American heritage and interest" and acting as a liaison for "the Native American community," not solely the Tataviam tribe. AR 512:55518. The selection of a Tataviam monitor was reasonable because the record demonstrates that the Project site was Tataviam, *see* AR 512:55487-88, although the Chumash also had ties to the surrounding area and the Tataviam, *see* AR 104:694-95. Moreover, the Corps did invite Chumash representatives to join the Programmatic Agreement regarding the protection of cultural resources. *See* AR 598:64902 (the three individuals invited to consult are in the record as having Chumash and Tataviam affiliations, *see* AR 112:28975); AR 519:63812-13; AR 520:63814-15; AR 524:63822-23. Lastly, in addition to requiring the Tataviam monitor, the mitigation measures provide for a "qualified archaeologist" to monitor the Project area as well. *See* AR 512:55517. The Corps thoroughly analyzed mitigation to protect Native American cultural resources in the Project area and adopted measures reasonably tailored to meet that goal; the Corps did not violate NEPA by not specifically discussing the use of a Chumash monitor.

Plaintiffs' final argument under NEPA is another attempt to fault the Corps for not analyzing a specific formulation of a mitigation measure. *See Pl. Mot.* 39:4-14. Under NEPA, impacts to historic properties should be avoided, minimized, or mitigated and that responsibility is a continuing one for the agency. *See* 36 C.F.R. § 800.6(a). Plaintiffs complain that the selection of mitigation measures related to the two identified archaeological sites – CA-LAN-2233 and CA-LAN-2133 – was flawed because the Corps did not consider a measure that would "commit" to feasible avoidance of the sites in the future. *Pl. Mot.* 39:4-14. The Project's mitigation measures anticipate that cultural sites 2233 and 2133 will be avoided and thereby preserved. *See* AR 512:55515. However, the future widening of State Route 126 ("SR-126") may make continued avoidance infeasible, requiring a different form of mitigation. *See* AR 512:55497-98. The Corps has outlined an alternative mitigation process. *See Def. Opp.* 42:16-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1667 PSG (CWx) | Date | June 30, 2015 |
|----------|----------------------|------|---------------|
| Title | Center for Biological Diversity, *et al.* v. United States Army Corps of Engineers, *et al.* | | |

27 (citing AR 512:55497-98, 766:104322-23). Plaintiffs contend that the Corps did not consider a mitigation measure that continued to avoid the cultural sites, even in the event of the SR-126 widening, but the alternate mitigation measures will only be triggered in the event that continued avoidance is no longer feasible. If Plaintiffs are actually complaining that the proposed alternative does not include specific feasibility standards, it is improper to require mitigation measures to *contain* particular elements under NEPA. *See Newhall Opp.* 41:6-20 (citing *Robertson*, 490 U.S. at 351-53). Plaintiffs have not explained how the Corps' analysis of how to avoid, minimize, or mitigate against impacts to CA-LAN 2233 and CA-LAN-2133, even in the event of future contingencies, was not sufficiently thorough under NEPA.

Thus, the Court concludes that Plaintiffs have not demonstrated that the EIS violates NEPA under any of their theories.

IV.     Conclusion

For the foregoing reasons, the Court GRANTS Federal Defendants' and Newhall's motions for summary judgment and DENIES Plaintiffs' motion for summary judgment.

**IT IS SO ORDERED.**